UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

**CIVIL MINUTES – GENERAL**

Case No. 2:19-cv-07077-FWS-AJR Date: October 10, 2024
Title: Miguel Gutierrez v. New Hope Harvesting, LLC, *et al.*

Present: **HONORABLE FRED W. SLAUGHTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Melissa H. Kunig | N/A |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| Not Present | Not Present |

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING IN SUBSTANTIAL PART MOTION FOR FINAL APPROVAL OF CLASS/PAGA SETTLEMENT, PLAINTIFF'S SERVICE AWARD, FLSA OPT-IN AWARDS, AND COUNSEL'S FEES & COSTS [227]**

In this 2019 case, Plaintiff brings claims under federal and state law against Defendant New Hope Harvesting LLC ("NHH"), Defendant Guadalupe Gaspar, Defendant Eugenia Gaspar Martinez, and Defendant Araceli Gaspar Martinez (the three individuals collectively, the "Gaspar Defendants") (NHH together with the Gaspar Defendants, "Defendants")[1], based on Defendants' alleged failures to properly pay overtime wages and minimum wages, provide proper rest and meal periods, and reimburse expenses related to Plaintiff and class members' field work for Defendants in the production of strawberries. (Dkt. 25 (First Amended Complaint, "FAC") ¶¶ 1-5, 9-11, 19-26, 34-92.) In August 2023, after substantial litigation, the parties reached a proposed settlement agreement (the "Settlement"). (Dkt. 214-3 ("SA").) The court granted preliminarily approval of the Settlement, (Dkt. 223 ("Preliminary Approval

[1] Plaintiff also brought claims against JDB Pro, Inc., doing business as Central West Produce LP ("JDB"). However, the court entered judgment in favor of JDB after the parties filed cross motions for summary judgment regarding Plaintiff's claims against JDB. (Dkt. 159.) Accordingly, Defendants are the only remaining defendants in this case.

Order" or "Prelim. App. Order")), and the court-appointed settlement administrator gave notice of the Settlement to class members, (*see generally* Dkt. 227-8). The deadline to opt-out or object to the Settlement passed on August 23, 2024, and no class member asked to be excluded from the Settlement or objected to the Settlement. (*Id.* ¶ 14.) Now before the court is Plaintiff's Motion for Final Approval of Class/PAGA Settlement, Plaintiff's Service Award, FLSA Opt-In Awards, and Counsel's Fees and Costs ("Motion" or "Mot."). (Dkt. 227.) No opposition to the Motion has been filed. (*See generally* Dkt.) The court held a hearing on the Motion on October 10, 2024. (Dkt. 231.) Based on the state of the record, as applied to the applicable law, the Motion is **GRANTED IN SUBSTANTIAL PART**.

## I. Background

### A. Factual and Procedural Background

Plaintiff filed this case in Santa Barbara Superior Court on June 14, 2019, and filed the operative First Amended Complaint in this court—at the time, before Judge Fernando M. Olguin—on February 4, 2020. (Dkt. 25 ("First Amended Complaint" or "FAC").) In the FAC, Plaintiff alleges facts including the following. "NHH [] operated on behalf of strawberry farms owned and controlled by growers and producers of berries, including JDB Pro, Inc." and "recruited, hired, and employed . . . foreign workers, including Plaintiff, through the H-2A program to harvest, package, and process strawberries." (*Id.* ¶¶ 11, 19.) "Defendants required or suffered or permitted Plaintiff and, on information and belief, Class Members to work without compensation, off-the-clock, to perform duties prior to and/or subsequent to the recorded time of their shifts," including by failing to compensate Plaintiff and other employees for travel time, performance of "preliminary tasks or preparatory duties," and required waiting time. (*Id.* ¶¶ 49-60.) In addition, the housing Defendants provided Plaintiff and other aggrieved employees "did not meet the minimum standards established under applicable state and federal laws." (*Id.* ¶ 64.) Defendants also "failed to provide Plaintiff and other aggrieved employees with a safe and healthful work environment during the workday as they handled strawberries," including by failing to provide soap in restrooms, failing to provide adequate

shade, and "imposing a production pace that was unreasonably excessive." (*Id.* ¶¶ 68-72.) Based on these allegations, Plaintiff asserts claims against Defendants under the Fair Labor Standards Act ("FLSA"); California Labor Code, including the Private Attorneys General Act ("PAGA"); and California's Unfair Competition Law. (*Id.* ¶¶ 118-253.)

The parties conducted "extensive discovery," including "over 15,000 pages of records produced by Defendants and 71,000 punched time cards," and "21 depositions, several of which occurred in Mexico." (Prelim. Appr. Order at 15-16; *see also* Mot. at 12.) The parties also conducted significant motion practice, including obtaining conditional certification of the FLSA collective, (Dkt. 100 (Order Conditionally Certifying FLSA Collective and Directing the Issuance of FLSA Notice)), and a ruling on the parties' cross motions for summary judgment regarding Plaintiff's claims against JDB, (Dkt. 154 (Order Re: Cross-Motions for Summary Judgment)).

The parties also participated in two mediation sessions—the first in October 2020 and the second in February 2023. (Prelim. Appr. Order at 16.) The parties "ultimately agreed to a settlement in principle on August 3, 2023." (*Id.*)

**B. The Proposed Settlement**

Under the Settlement, Defendants agree to pay a Gross Settlement Amount of $1,000,000, plus the employer share of payroll taxes, to resolve Plaintiff's class, collective, and representative claims. (SA ¶ I.Z; Mot. at 2.) The Net Settlement Amount—the Gross Settlement Amount minus court-approved payments to Plaintiff, FLSA Opt-In Plaintiffs, Class Counsel, and the settlement administrator—will be distributed to eligible class members based on the number of workweeks worked. (*See* SA ¶ III.C.) In exchange for the Settlement's benefits, participating class members agree to release, among other rights, claims against Defendants that were or could have been alleged in the FAC. (*Id.* ¶ V; *see* SA Ex. A ("Notice") at 1 ("If you don't exclude yourself, you are entitled to receive money from the Settlement. In

exchange, you will give up your right to assert the wage claims against Defendants that are covered by this Settlement.”).)

### C. Notice to the Class and Response

After the court granted preliminary approval of the Settlement, (*see generally* Prelim. Appr. Order), the court-appointed settlement administrator, Atticus Administration LLC (“Atticus”), mailed notice in English and Spanish “to 816 Class Members and Aggrieved Employees for whom complete mailing addresses were available.” (Dkt. 227-8 (Declaration of Bryn Bridley, “Bridley Decl.”) ¶ 6, Ex. A (Class Notice).) “Of the 816 Class Notices sent by mail, 204 were returned to Atticus as undeliverable.” (*Id.* ¶ 7.) Two of the returned notices “include[ed] forwarding address information from the USPS and those notices were promptly remailed.” (*Id.*) “One hundred seventy-three (173) of the remaining undeliverable records were sent to a professional search firm for address tracing. New addresses were found for 47 undeliverable records and were not found for 126 undeliverable records. Notices were promptly remailed to the 47 new addresses received, nine (9) of which were returned to Atticus a second time. Thirty-one (31) undeliverable records received at or after the Class Members’ Response Deadline were not traced.” (*Id.*) “As such, 652 or 79.90% of the Class Notices sent by mail were successful.” (*Id.*)

“On June 24, 2024, Atticus also sent the Class Notice to 86 Class Members and Aggrieved Employees via WhatsApp and notified 53 Class Members and Aggrieved Employees of the settlement through text messaging.” (*Id.* ¶ 8.) “86 of the 86 notices sent through WhatsApp and 35 sent by text were successfully delivered. Thus, when combined with the mailed Class Notices, a total of 955 Class Notices were dispersed to 882 Class Members and Aggrieved Employees, 80.94% were successfully sent, and notice was attempted in at least one (1) of the three (3) methods to all Class Members and Aggrieved Employees.” (*Id.* ¶ 9.)

The notices Atticus sent to class members contained “printed . . . Pro-rated Individual Class Payments.” (*Id.* ¶ 17.) Those payments “were based on the entire Settlement Class,” and

"were calculated by dividing the Net Settlement Amount of $418,200 by the total number of Workweeks worked by all Participating Class Members during the Class Period to arrive at a value of $22.50 per Workweek," which "value was then multiplied by each Participating Class Members Workweeks," resulting in "payments rang[ing] from $22.50 to $7,267.77 with a $474.15 average and a median amount of $112.50." (*Id.*) "Individual PAGA Payments included in the Class Notice were calculated in the same way as Individual Class Payments with a per Workweek value of $0.28 for a total of 511 Aggrieved Employees who worked 13,169 Pay Periods during the PAGA Period and the PAGA allocation of $3,750. Individual PAGA Payments ranged from $.28 to $70.36 with a $7.34 average payment and a median amount of $2.85." (*Id.*)

Atticus also created a settlement website, the content of which "can be viewed in English or Spanish," a toll-free help line, and an email address for this action. (*Id.* ¶¶ 10-12.) "[T]he website has been viewed a total of 236 times since its inception," and "Atticus has logged communications with Class Members and Aggrieved Employees as follows: 59 emails and WhatsApp conversations and 6 telephone calls." (*Id.* ¶¶ 11-12.)

"Class Members had until August 23, 2024 to submit a request to be excluded from the settlement, object to the Settlement terms, or challenge the Workweek information included in their Class Notices. No exclusion requests, objections, or Workweek challenges were received by Atticus." (*Id.* ¶ 14.)

## II. Discussion

In deciding whether to grant the Motion, the court analyzes (1) whether to certify a class for settlement purposes, (2) the fairness of the Settlement, and (3) the adequacy of the Settlement of the PAGA claims.

### A. Class Certification

Plaintiff requests certification of the following class for settlement purposes:

> All non-exempt agricultural employees who performed field work for Defendants in the production of strawberries—including, but not limited to, tasks such as planting, cultivating, pruning, harvesting, picking, and packing—in California at any time between February 4, 2016, through the date of preliminary approval.

(Dkt. 227-18 (Proposed Order) at 2; SA ¶ I.E.) When a plaintiff seeks provisional class certification for settlement purposes, a court must ensure Federal Rule of Civil Procedure 23(a)'s four requirements and at least one of Rule 23(b)'s requirements are met. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003); Fed. R. Civ. P. 23(e)(1)(B)(i) (stating that notice to the class must be given "if giving notice is justified by the parties' showing that the court will likely be able to . . . certify the class for purposes of judgment on the proposal"). In this case, Plaintiff seeks certification under Rule 23(b)(3), which permits certification if a court "finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The court previously concluded that Plaintiff presented sufficient evidence to show that the proposed class satisfies the Rule 23(a) and (b)(3) requirements. (*See* Prelim. Appr. Order at 7-13.) Having reviewed those requirements again, the court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only. *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has changed to disturb that conclusion, and class certification remains appropriate.").

**B. Fairness of the Settlement**

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e). This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton*, 327 F.3d at 959 (cleaned up).

Rule 23(e) governs class action settlement approval. Courts may approve class action settlements only when they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In making this determination, courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other. *Id.* 23(e)(2)(A-D).

**1. Adequacy of Class Representative and Class Counsel**

For reasons including those explained in the court's analysis of the Rule 23(a) factors at the preliminary approval stage, the court finds Plaintiff and Class Counsel have ably represented the class to date and have secured a significant settlement. (Prelim. Appr. Order at 9-10.) "The Court is unaware of any conflict of interest between Plaintiff[] and the proposed class." *Dean v. China Agritech*, 2012 WL 1835708, at *5 (C.D. Cal. May 3, 2012); (*see* Prelim. Appr. Order at 10). "Plaintiff's claims are identical to those of the class and []he has every incentive to vigorously pursue those claims." *Becerra-S. v. Howroyd-Wright Emp. Agency, Inc.*, 2020 WL 8571838, at *3 (C.D. Cal. Oct. 5, 2020). "Nor is there any evidence that [Class Counsel] will not adequately represent or protect the interests of the class." *Id.* Class Counsel has significant experience litigating class actions, and appears "qualified and competent."

*Hanlon*, 150 F.3d at 1020; (*see* Mot. at 13; Prelim. Appr. Order at 16-17). Accordingly, the court finds this factor weighs in favor of granting final approval.

**2. Arm's Length Negotiation**

Rule 23(e)(2)(B) requires that "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Plaintiff represents that "the parties participated in two mediations," with the first "in October 2020 before mediator Nikki Tolt, and the second . . . on February 21, 2023 with a different mediator, Judge Patricia Cowett (retired)." (Dkt. 214-1 (Motion for Preliminary Approval) at 19.) "Neither mediation resulted in settlement, however, [] Defendants produced financial records for Plaintiff's counsel to review ahead of the second mediation, and this laid the groundwork for further informed, arms-length negotiations following the mediation that eventually led the parties to reach a settlement in August 2023." (*Id.*)

The court finds that the Settlement is the result of arms-length negotiations between the parties. The parties' settlement negotiations occurred before two neutral private mediators, one of whom is a retired judge. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (explaining that although the "mere presence of a neutral mediator . . . is not on its own dispositive," it is "a factor weighing in favor of a finding of non-collusiveness"); *Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *6 (C.D. Cal. Feb. 22, 2022) ("The parties extensively negotiated the Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before [the] mediator."); *Thompson v. Transamerica Life Ins. Co.*, 2020 WL 6145105, at *3 (C.D. Cal. Sept. 16, 2020) ("The Settlement is the product of extensive negotiations between the Parties with the assistance, and direct supervision, of an experienced and highly-regarded nationally-renowned mediator . . . who conducted a full-day, in-person mediation with all Parties as well as a follow-up mediation telephone conference with all Parties."). And the negotiations occurred between experienced counsel. *See Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *3 (C.D. Cal. May 6, 2014) ("The fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight.") (cleaned up).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:19-cv-07077-FWS-AJR Date: October 10, 2024
Title: Miguel Gutierrez v. New Hope Harvesting, LLC, *et al.*

Moreover, as explained in the Preliminary Approval Order and further explained in Section II.B.3.c., *infra*, although the Settlement contains a clear sailing arrangement, the Settlement does not appear to have any other "subtle signs" of collusion that courts must police, and the clear sailing arrangement does not appear indicative of collusion. *See Roes, 1-2 v. SFBSC Mgmt.*, LLC, 944 F.3d 1035, 1048 (9th Cir. 2019). The court therefore finds this factor weighs in favor of granting final approval.

**3. Adequacy of Class Relief**

In determining whether class relief is "adequate," courts must analyze "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C).[2]

[2] Before Congress codified these factors in 2018, the Ninth Circuit instructed district courts to apply the following factors in determining whether a settlement agreement was fair, reasonable, and accurate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Roes, 1-2*, 944 F.3d at 1048; *Staton*, 327 F.3d at 959. These are the factors Plaintiff addresses in the Motion. (*See generally* Mot.) And the court still considers these factors to the extent that they shed light on the Rule 23(e) inquiry. *See Wong v. Arlo Techs., Inc.*, 2021 WL 1531171, at *8 (N.D. Cal. Apr. 19, 2021).

### a. The Costs, Risks, and Delay of Trial and Appeal

As an initial matter, the court finds that $1 million Settlement reflects a substantial outcome for class members. Indeed, as noted, under the Settlement class members—who are immigrants that performed field work for Defendants in strawberry fields—will receive an average award of $474.15. (Bridley Decl. ¶ 17; *see* Mot. at 1, 12; Prelim. Appr. Order at 17.)

The court further finds the benefits class members will receive under the Settlement present a fair compromise given the costs, risks, and delay of trial and appeal. The parties performed substantial litigation in this case before reaching the proposed Settlement, including conducting substantial discovery including 21 depositions, obtaining conditional certification of a FLSA Collective, receiving a summary judgment ruling and considering possible appeal of the court's summary judgment ruling, and participating in two mediations. (Prelim. Appr. Order at 16.) With information from that litigation, the parties were able to realistically value the scope of Defendants' potential liability and assess the costs, risks, and delay of moving forward with class certification, motion practice, and trial. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (explaining that approving the settlement is favored when the "parties have sufficient information to make an informed decision about settlement" (cleaned up)).

The court observes that those costs and risks are not insignificant, "both from legal and practical standpoints." (Prelim. Appr. Order at 18.) In the Preliminary Approval Order, the court detailed several sources of both cost and risk: "the potential lack of documentary evidentiary proof supporting some of [Plaintiff's] claims, noting the class's claims dependent on rest and meal breaks would rely on testimonial evidence"; that "Plaintiff's travel claim was hotly contested and that the facts developed in this case presented a novel question which could have gone in favor of Plaintiff or Defendants"; that "the estimated $11 million in potential recovery under the PAGA claim is uncertain because courts have discretion to reduce the civil penalty award in PAGA cases, and the $11 million estimate assumes a maximum amount of civil penalties"; "Defendants' ability to pay." (*Id.* at 18-19 (cleaned up).) Similarly, in the

Motion, Plaintiff represents that "[t]he compromise figure proposed by the Settlement also takes into account that Defendant[s] vigorously contest[] liability in this action, are represented by talented counsel, and are prepared to vigorously defend against these claims if the action is not settled," and that "the greatest risk with continuing toward trial in this matter case was the NHH Defendants' ability to pay.") (Mot. at 10-11.)

In addition, although as noted substantial fact discovery had occurred, "[e]xtensive and expensive expert discovery would also be necessary" to proceed to trial. *Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at *7 (C.D. Cal. July 24, 2023). There would also be significant costs and risks associated with class certification, further summary judgment practice, and trial. *See In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement." (citation omitted)). Even if Plaintiff were able to certify a class, there would also be a risk that the court could later decertify the class. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement."). In addition, even if Plaintiff could secure a better result than the Settlement represents at trial, any result obtained after additional litigation or trial would take significantly longer and there is a risk that Plaintiff could have received much less, or nothing at all. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation). And as noted in the Preliminary Approval Order, "Plaintiff's counsel verified that Defendants were financially constrained," and "Defendants' ability to pay" could have hindered recovery of any judgment. (Prelim. Appr. Order at 19; Mot. at 11); *see Gutierrez v. Amplify Energy Corp.*, 2023 WL 3071198, at *3 (C.D. Cal. Apr. 24, 2023) ("[T]he monetary relief here is a strong result for the Class in light of the costs and risks of delay of litigation, particularly given Amplify's available funds. . . . [T]he Settlement represents a large portion of the insurance funds that remain

available to Amplify to pay claims—an amount that will only decrease with time as Amplify pays ongoing clean-up, litigation and other costs."); *In re Diamond Foods, Inc., Sec. Litig.*, 2014 WL 106826, at *2 (N.D. Cal. Jan. 10, 2014) ("It is not unreasonable for counsel and the class representative to prefer the bird in hand, given concerns about Diamond's strained financial state and its ability to pay a judgment following further litigation.") (cleaned up); *In re Critical Path, Inc.*, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002) ("Through protracted litigation, the settlement class could conceivably extract more, but at a plausible risk of getting nothing . . . ; watching Critical Path fall into bankruptcy; and, most certainly, drying up the available insurance."); *Stratton v. Glacier Ins. Administrators, Inc.*, 2006 WL 3388528, at *4 (E.D. Cal. Nov. 22, 2006) (considering "self-exhausting nature of defendants' insurance policies and lack of identifiable assets sufficient to satisfy judgments" under this factor to weigh in favor of granting final approval).

There is another significant benefit of settling now: the professional and safety risks further litigation could create. Plaintiff explains that "many workers felt scared to participate" in this case "because they feared negative consequences." (Gutierrez Decl. ¶ 14.) Those negative consequences included professional consequences, such as "potential blacklisting with recruiters in the San Quintin area who recruit workers to work seasonally as farmworkers in the U.S." (Dkt. 227-15 (Declaration of Isabel Hernandez Jacobo, "Jacobo Decl.") ¶ 5; Gutierrez Decl. ¶ 7; *see also* Dkt. 227-16 (Declaration of Jorge Luis Almarez Hernandez, "Hernandez Decl.") ¶ 11 ("I thought the treatment we received was unfair, and when I was employed, I tried to do something about it with my brother and another co-worker, but we were not successful and my employment with the company was cut short because of our attempts to improve working conditions.").) Unfortunately, the feared negative consequences extended even to Plaintiff and the opt-in plaintiffs' own safety. Opt-in plaintiffs expressed fears regarding "the connections" Defendants may "have in the San Quintin area of Baja w[h]ere . . . many of the class members live." (Jacobo Decl. ¶ 5.) Notably, their fears regarding possible danger were not unfounded, with one of their depositions in Mexico being interrupted so that the opt-in plaintiff and her counsel could "flee the location to escape danger" so severe they "believed [their] lives were at risk." (*Id.* ¶ 9.) More than one opt-in plaintiff testified that she was "scared

that something could happen to [her]" in relation to her deposition testimony even after a court in Mexico "implemented some protective measures," but she made the courageous decision to testify anyway. (Dkt. 227-11 (Declaration of Alejandra Flores, "Alejandra Flores Decl.") ¶ 10; Jacobo Decl. ¶ 10.) The Settlement may not eliminate the fears the opt-in plaintiffs and other class members have, but it may do something to lessen them.

The court finds that elimination of all of these costs, risks, and delays weighs heavily in favor of approving the Settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *Curtis-Bauer v. Morgan Stanley & Co., Inc.*, 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

**b. The Effectiveness of the Proposed Method of Distribution of Class Relief**

Next, the court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

In this case, the court finds the claims processing and relief distribution processes are straightforward. Class members who do not exclude themselves are entitled to receive money from the Settlement. (Notice at 1.) Class members have three options for receiving payment: check, bank transfer, or digital credit card. (*Id.*) Class members must contact Atticus by telephone, WhatsApp, or email to communicate their preferred method of payment. (*Id.*; S.A. ¶ E.1. ("Election of Payment Method"); *see also* SA ¶ IV.H. ("The Administrator will issue payments for Individual Class Payments, FLSA Member Collective Payments, and/or

Individual PAGA Payments and send them to the Class Members participating in the Settlement via the method elected by the Class Member and communicated to the Administrator.").) The court finds these procedures are not unduly demanding and therefore concludes that this factor weighs in favor of granting final approval.

**c. Attorney Fees Award**

Next, the court must consider "the terms of any proposed award of attorneys' fees, including timing of payment," in determining whether the class's relief is adequate. Fed. R. Civ. P. 23(e)(2)(c). When reviewing attorney fee requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees. *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *Bluetooth*, 654 F.3d at 944-45. In considering the proposed attorney fee award, the court must also scrutinize the Settlement for three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class. *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).

Here, Class Counsel seeks one-third of the $1,000,000 Gross Settlement Amount. (Mot. at 18.) Regarding the factors tending to show collusion, the court observes that the Settlement does not contain a reverter provision under which unawarded fees would revert to Defendants rather than the class. (*See generally* SA.) As noted, the Settlement does contain a clear sailing term under which "NHH DEFENDANTS will not oppose requests for . . . [a] Class Counsel Fees Payment of not more than 33 and 1/3% of the Gross Settlement Amount, which is currently estimated to be $333,300.00 and a Class Counsel Litigation Expenses Payment of not more than $90,000 . . . provided that the requests do not exceed these amounts." (SA ¶ III.C.3.) "This causes some concern for the Court because it represents some form of agreement, by Defendant, not to oppose a motion for attorneys' fees. Additionally, the agreement was made

over a percentage of the total settlement value, 33%, that exceeds the 25% benchmark that courts in the Ninth Circuit typically find reasonable." *Gruber v. Grifols Shared Servs. N. Am., Inc.*, 2023 WL 8610504, at *9 (C.D. Cal. Nov. 2, 2023).

However, the court notes that the clear sailing arrangement is not a "death knell" for approval, but rather means that the court must scrutinize the Settlement for signs that the fees counsel requests are unreasonably high. *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021). Specifically, the court must "peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class" even when the settlement has been negotiated "with a neutral mediator before turning to fees." *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021). And given the substantial benefits the Settlement provides to the class, the court finds that the clear sailing arrangement does not raise collusion concerns sufficient to deny final approval of the amount of fees Class Counsel seeks. *See, e.g.*, *Marjorie Saint Hubert et al. v. Equinox Holdings, Inc. et al.*, 2024 WL 4327402, at *7 (C.D. Cal. July 22, 2024) (granting final approval despite presence of clear sailing agreement because "any potential for collusion that could come from the arrangement is offset because neither the attorneys' fees are excessively high nor does the Settlement Agreement contain a reverter clause").

The court also observes that, although 25% is the benchmark, courts frequently award requests for 33% of the fund, and finds that doing so is appropriate here. First, "[i]n awarding percentages of the class fund, courts frequently take into account the size of the fund," and "[c]ases of under $10 Million," like this one, "will often result in result in fees above 25%." *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008). Second, California courts routinely grant 33% attorney fee awards in wage-and-hour class actions such as this one. (Mot. at 18-19 (collecting cases).) And third, courts depart upward from the 25% benchmark after considering "the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency

basis." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (internal quotations omitted). Here, the court finds Class Counsel achieved exceptional results for the class, in the cash settlement fund and injunctive relief beyond that fund, in a case that was very risky for Class Counsel and litigated on a contingency basis. (*See* Mot. at 19-23.) In addition, the court acknowledges that Class Counsel faced real danger litigating this case; one of the opt-in plaintiffs described that in the "very scary" deposition situation, not only the opt-in plaintiffs "and the other workers who were there," but also "the attorney and a member of his staff, believed [their] lives were at risk." (Jacobo Decl. ¶ 9.) This further weighs in favor of approving the 33% award.

A lodestar cross-check also confirms the reasonableness of the requested award. Courts commonly perform a lodestar cross-check to assess the reasonableness of the percentage award. *See In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 784 (9th Cir. 2022) ("A cross-check is discretionary, but we encourage one when utilizing the percentage-of-recovery method."); *Vizcaino*, 290 F.3d at 1050 ("Calculation of the lodestar, which measures the lawyer's investment of time in the litigation, provides a check on the reasonableness of the percentage award."); *Bluetooth*, 654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a reasonable percentage award"); *see also Chambers v. Whirlpool Corp.*, 980 F.3d 645, 663 (9th Cir. 2020) (confirming that a lodestar cross-check is "ordinarily" not required). Class Counsel submitted evidence of a $1,402,707.50 lodestar, meaning the requested fee represents a negative multiplier of 24%. (Mot. at 24); *see Vizcaino*, 290 F.3d at 1051. Whereas "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases," and "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied," *Vizcaino*, 290 F.3d at 1051 n.6, Class Counsel here seeks a fee with a negative multiplier. *See also Gutierrez*, 2023 WL 3071198, at *6 (describing multipliers ranging from one to four as "presumptively acceptable") (citing *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014)). The court has reviewed the information provided and concludes that the lodestar amount with the negative multiplier fairly compensates the attorneys in this case given the excellent result they achieved for the class; the able representation of counsel; the investigation, discovery, litigation, negotiation, and other

work performed; and the substantial risk counsel undertook in this wage-and-hour class action. *See In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained"). The court therefore concludes that Class Counsel's lodestar confirms the reasonableness of the fees sought.

In addition, the court has also reviewed Class Counsel's request for $83,650.74 in litigation costs incurred for deposition transcripts, expert fees, scanning services, travel expenses, payroll and timekeeping database analysis, and forensic account analysis. (Mot. at 25-26.) The court observes that these are generally the types of expenses that are reasonably and necessarily incurred in litigation and routinely charged to paying clients in non-contingency cases. *See Bato v. Lab'y Corp. of Am. Holdings*, 2011 WL 13412376, at *17 (C.D. Cal. Mar. 14, 2011) (explaining that discovery costs "paved the way for settlement," and computerized legal research "was necessary to examine the legal basis for plaintiffs' claims" and to oppose a motion to dismiss). The court therefore finds $83,650.74 in costs to be reasonable and supported by the documentation submitted.

The court will make one change in calculating class counsel's fee: it will apply the percentage award after deducting litigation and administration costs from the common fund. "In other words, to calculate attorney fees in this case, the court will apply the [percentage fee award] to the amount the class recovers." *Farrar*, 2023 WL 5505981, at *10; *Carter v. Vivendi Ticketing US LLC*, 2023 WL 8153712, at *8 (C.D. Cal. Oct. 30, 2023). Calculating the percentage fee before deducting expenses would mean that Class Counsel not only gets reimbursed for its costs but also receives an additional 33% of those costs as a fee. *See, e.g.*, *Smith v. Experian Info. Sols., Inc.*, 2020 WL 6689209, at *7 (C.D. Cal. Nov. 9, 2020) (calculating benchmark fees by deducting litigation costs and settlement administrator costs from the settlement amount, and taking 25% of that amount); *In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176, 1182 (N.D. Cal. 2014) (same); *Kmiec v. Powerwave*

*Techs., Inc.*, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (same); *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same). And deducting the settlement administrator's expenses before calculating the fee ensures that class counsel's incentive remains keeping those costs low. *Farrar*, 2023 WL 5505981, at *10; *Carter*, 2023 WL 8153712, at *8. Subtracting from the $1 million Settlement amount $28,850 for Atticus' settlement administration costs, (Bridley Decl. ¶ 19), and $83,650.74 in litigation costs yields $887,499.26. Applying the 33.33% rate to that sum yields $295,833.09. Accordingly, the court will award Class Counsel $295,833.09 in attorney fees.

In addition to the amount of Class Counsel's fees and costs, the court must scrutinize the timing of payment. Fed. R. Civ. P. 23(e)(2)(c). The Settlement provides that "[w]ithin 14 days after NHH DEFENDANTS fully fund the Gross Settlement Amount, the Administrator will make payments for all Individual Class Payments, all FLSA Member Collective Payments, all Individual PAGA Payments, the LWDA PAGA Payment, the Administration Expenses Payment, the Class Counsel Fees Payment, the Class Counsel Litigation Expenses Payment, and the Class Representative Service Payment, and the FLSA Opt-In Enhancement Payments. Disbursement of the Class Counsel Fees Payment, the Class Counsel Litigation Expenses Payment, and the Class Representative Service Payment shall not precede disbursement of Individual Class Payments, FLSA Member Collective Payments, and Individual PAGA Payments." (SA ¶ IV.G.) Because class members will be paid before Class Counsel is paid, the court concludes that the timing of payment does not weigh against granting final approval. *See Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as Class Members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.")).

#### d. Agreements Required to Be Identified Under Rule 23(e)(3)

The court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in

connection with the proposal," *id.* 23(e)(3). The parties have identified no agreement other than the proposed Settlement.

**e. Service Awards**

Next, the court considers the service awards requested. The Motion requests that the court grant Plaintiff a $20,000 incentive award and each of the FLSA opt-in plaintiffs a $7,500 award. (Mot. at 14.) Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit. *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). Such awards "are fairly typical in class action cases" and are discretionary. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). They are also awarded to named plaintiffs in FLSA collective actions. *Medina v. Evolve Mortgage Services, LLC*, 2023 WL 11915763, at *10 (C.D. Cal. April 3, 2023) ("At its discretion, a district court may award an incentive payment to the named plaintiffs in a FLSA collective action to compensate them for work done on behalf of the class."). Service or incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 959-59. In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see also Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases).

Regarding Plaintiff's award, the Motion contends a $20,000 service award

> is warranted for the critical role he played in stepping forward to bring this case, the time and effort he expended to help secure the positive collective outcome on the case, and the risks he assumed in the lawsuit. Plaintiff has dedicated many hours to this lawsuit including: phone conversations and emails with his attorneys to share his work

> experience, staying updated on the case, discussing outreach to other workers and opt-in plaintiffs; searching for and reviewing his wage statements and timekeeping documents with counsel; responding to request for information related to his work experience; responding to multiple rounds of discovery; sitting for his deposition; and discussing the proposed settlement before and after preliminary approval with fellow Class and Collective Members. As Mr. Gutierrez's declaration details, in all he has an estimated 73 hours in service of the Class and the Collective.

(Mot. at 15 (record citations omitted); *see* Dkt. 228 (Declaration of Miguel Gutierrez).)

Although the court finds that a substantial service award is appropriate for Plaintiff, the court is not persuaded that a $20,000 service award is appropriate. When evaluating the reasonableness of an incentive award, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation. *Staton*, 327 F.3d at 977. "Overcompensating named plaintiffs at the expense of a reduction in the common fund available to class remembers could encourage collusion at the settlement stage of class actions where a named plaintiff's interest naturally diverges from that of the class, compromising his role as a judge of adequacy." *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014).

Here, the court observes that Plaintiff represents in the Motion that "[t]he requested service awards are consistent with approved settlements in nearby districts," but the authority Plaintiff cites are to cases awarding a $10,000 service award and a $15,000 service award; Plaintiff does not cite cases where courts approved $20,000 service awards. (Mot. at 14.) And the authority the court has found regarding $20,000 service awards indicates that such an award is not appropriate here. *See, e.g.*, *Rabin v. PricewaterhouseCoopers LLP*, 2021 WL 837626, at *10 (N.D. Cal. Feb. 4, 2021) (approving $20,000 service awards when the two plaintiffs spent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:19-cv-07077-FWS-AJR Date: October 10, 2024
Title: Miguel Gutierrez v. New Hope Harvesting, LLC, *et al.*

300 and 490 hours "fulfilling their roles" as class representatives) (citing case where plaintiffs who spent 624 hours and 451 hours received $35,000 and $25,000 awards, respectively); *Romero v. Securus Techs., Inc.*, 2020 WL 6799401, at *9 (S.D. Cal. Nov. 19, 2020) (rejecting request for $20,000 service awards and instead approving $10,000 service awards); *Ontiveros*, 303 F.R.D. at 366 (rejecting request for $20,000 service award when the named plaintiff spent 271 hours on his duties, and instead approving $13,550 service award). Indeed, "[t]his award is nearly four times the amount that is deemed presumptively reasonable in this District," and "[i]t is also 2 percent of the gross settlement funds, which is higher than what other courts have found acceptable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015). "The amount of the award seems all the more excessive and less reasonable in light of the discrepancy it will create between Plaintiff's take-home compared to the award other members of the class will earn: compared to Plaintiff's $20,000, the average estimated settlement award for class member is" $474. *Id.* (analyzing situation where average class member take home was "just over $450." *Id.* Instead, under the circumstances presented here, including Plaintiff's significant contributions to the prosecution of this case, the approximately 73 hours he spent fulfilling his role as class representative, the considerable risk he undertook participating in this case, and because he will also sign a general release that is broader than the release applicable to other class members, the court finds that a $15,000 service award is appropriate. *See, e.g.*, *Rabin*, 2021 WL 837626, at *10; *JD Tamimi v. SGS North America Inc.*, 2021 WL 12306353, at *13 (C.D. Cal. Sept. 1, 2021) (approving $15,000 incentive award on $850,000 gross settlement amount under which "participating Class Members will receive on average award of $3,208.44" when the plaintiff spent "over 100 hours working" on the case, including being deposed, and undertook "great personal risk in serving as class representative, including risk to future job opportunities").

Plaintiff also seeks "$7,500 enhancement awards to each FLSA opt-in plaintiff," arguing such awards are justified by these plaintiffs' time spent responding to discovery requests, providing declarations, being deposed, and for the risks they undertook participating in this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:19-cv-07077-FWS-AJR Date: October 10, 2024
Title: Miguel Gutierrez v. New Hope Harvesting, LLC, *et al.*

case. (Mot. at 15-16.) For most of the opt-in FLSA plaintiffs, the court finds that a $7,500 award is justified. *See, e.g.*, *Heid v. CyraCom Int'l, Inc.*, 2024 WL 4008650, at *14 (S.D. Cal. Aug. 30, 2024) (approving awards of $7,500 each when the cumulative total of those awards was "only 0.83% of the Gross Settlement Amount," there were "declarations from each Named Plaintiff . . . discussing their time invested and reputational risks," and no collective or class member had objected to the requested award); *Cooks v. TNG GP*, 2021 WL 5139613, at *4 (E.D. Cal. Nov. 4, 2021) (approving "three named plaintiffs' request for a $7,500 incentive award each"); *Medina*, 2023 WL 11915763, at *10 (approving $7,500 incentive award when "[a]lthough the precise amount of time and effort Plaintiff expended advancing the litigation is not clear, it is apparent that the Collective benefitted from Plaintiff's decision to file suit and pursue this action," and "[i]n agreeing to file suit, Plaintiff assumed the risk of having a judgment entered against her in the event she did not prevail, and likewise faced possible repercussions from being publicly identified as having sued her employer"); *Gant v. ALDI, Inc.*, 2021 WL 4050936, at *8 (C.D. Cal. Aug. 25, 2021) (rejecting requests for $10,000 service awards because "[a]lthough their work was valuable, and it presented certain risks to Plaintiffs in terms of future employment opportunities, compensation at this level is still not warranted," and instead approving $7,500 and $6,000 awards).

However, based on the particular facts presented, the court is not persuaded that each of the opt-in plaintiffs is entitled to the same award. Accordingly, the court reallocates the total amount of proposed incentive awards—$7,500 times eight, or $60,000—and approves the following awards:

1. <u>Catalino Ruben Almaraz</u>: Mr. Almaraz declares that he spent more than 30 hours on the case, including traveling 8 hours round trip by bus to be deposed in person in Tijuana, responding to written discovery served on him, and providing a declaration in support of class certification. (Dkt. 227-10 (Almaraz Decl.) ¶¶ 9-10, 14.) The court approves an award of **$7,500**.

2. Isabel Hernandez Jacobo: Ms. Jacobo declares that she spent more than 40 hours on the case, including providing a declaration in support of class certification and a harrowing deposition experience. (Jacobo Decl. ¶¶ 8-9.) Ms. Jacobo's deposition was "scheduled as a half-day deposition" but "was suspended after about an hour after it commenced due to threats we were experiencing at the deposition location," when she and her attorneys "had to flee the location to escape danger." (*Id.* ¶ 9.) The situation was "very scary," to the point where Jacobo "and the other workers who were there, as well as the attorney and a member of his staff, believed [their] lives were at risk." (*Id.*) Jacobo worked with counsel to secure a protective order, including preparing a declaration, which resulted in a court "implement[ing] some protective measures, one of which provided that the depositions would take place away from Camalu at locations, dates, and times unknown to the defendants." (*Id.* ¶ 10.) Ms. Jacobo states that "[w]hile [she] was still scared that something could happen to [her], [she] felt safer doing the deposition away from Camalu, and [she] knew the lawyers were doing everything they could to ensure [their] safety." (*Id.* ¶ 10.) Ms. Jacobo traveled another 8 hours round trip by bus to Tijuana for the rest of her deposition, staying overnight in Tijuana for this purpose. (*Id.* ¶ 11.) The court approves an award of **$10,000**.

3. Jorge Luis Almarez Hernandez: Mr. Hernandez declares that he spent more than 30 hours on the case, including being deposed in person in Baja California, providing a declaration in support of the motion for protective order, responding to written discovery served on him, and providing a declaration in support of class certification. (Hernandez Decl. ¶¶ 7-9, 13.) The court approves an award of **$10,000**.

4. Rocio Vasquez: Ms. Vasquez declares that she spent more than 38 hours on the case, including being deposed by videoconference in Baja California, providing a declaration in support of the motion for protective order, responding to written discovery served on her, and providing a declaration in support of class certification. (Dkt. 227-17 (Vasquez Decl.) ¶¶ 7-10, 14.) The court approves an award of **$10,000**.

5. Alejandra Flores: Ms. Flores declares that she spent more than 38 hours on this case, including an 8 hour round-trip bus ride to be deposed in person in Tijuana, providing a declaration in support of the motion for protective order, responding to written discovery served on her, and providing a declaration in support of class certification. (Alejandra Flores Decl. ¶¶ 8-10, 14.) Ms. Flores states that she testified at her in-person deposition despite being "scared that something could happen to [her]" even with the protective measures in place." (*Id.* ¶ 10.) The court approves an award of **$10,000**.

6. Claudia Flores: Ms. Flores declares that she spent more than 14 hours working on this case, including helping respond to written discovery that was served on her and providing a declaration in support of class certification. (Dkt. 227-12 (Claudia Flores Decl.) ¶¶ 8, 11.) The court approves an award of **$2,500**.

7. Dionisia Bolanos: Ms. Bolanos declares that she spent more than 34 hours on this case, including being deposed by videoconference in Baja California, responding to written discovery served on her, and providing a declaration in support of class certification. (Dkt. 227-13 (Bolanos Decl.) ¶¶ 8-9, 13.) The court approves an award of **$7,500**.

8. Eligio Ruiz: Mr. Ruiz declares that he spent more than 20 hours working on this case, including helping respond to written discovery that was served on him and providing a declaration in support of class certification. (Dkt. 227-14 (Ruiz Decl.) ¶¶ 8, 12.) The court approves an award of **$2,500**.

### 4. Equitable Class Member Treatment

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). "Matters of concern could

include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement, class members will receive differing payouts based on the number of workweeks the class member worked. (*See* SA ¶ III.E.) Specifically, class members will receive "[a]n Individual Class Payment calculated by (a) dividing the Net Settlement Amount by the total number of Workweeks worked by all Participating Class Members during the Class Period and (b) multiplying the result by each Participating Class Member's Workweeks." (*Id.*) The court finds this difference in treatment is appropriate and reasonable. *See, e.g.*, *Ranger v. Shared Imaging, LLC*, 2023 WL 8528489, at *8 (E.D. Cal. Dec. 8, 2023) ("Given that the logic of this is to distribute the funds as equitable as possible on a pro rata basis based upon their number of workweeks each class member worked (and based on their rate of pay), the agreement treats class members equitably, and the proposed distribution plan supports final approval."); *Cooks*, 2021 WL 5139613, at *4 ("The members' respective shares will be allocated on a pro-rata basis based on the number of compensable workweeks each member worked. Calculating respective shares in this manner is fair and treats class members equitably.") (internal citation omitted); *Moreno v. Beacon Roofing Supply, Inc.*, 2020 WL 1139672, at *9 (S.D. Cal. Mar. 9, 2020) ("Here, the settlement treats each class member equally as each class member's settlement payment will be calculated pro rata based on the number of workweeks they worked during the relevant time period."). Accordingly, the court concludes the Settlement treats class members equitably.

### 5. Response to Notice

The court also considers the class' response to the notice in determining whether the Settlement is fair, reasonable, and adequate. *See Alfred v. Pepperidge Farm*, 2022 WL 17066171, at *7 (C.D. Cal. Mar. 4, 2022) ("Because the notice process has been completed, the reaction of Class Members to the Settlement Agreement may be considered in evaluating

whether it is fair and appropriate."). As explained, "955 Class Notices were dispersed to 882 Class Members and Aggrieved Employees, 80.94% were successfully sent, and notice was attempted in at least one (1) of the three (3) methods to all Class Members and Aggrieved Employees." (Bridley Decl. ¶ 9.) Atticus also established and maintained a settlement website that has been viewed at least 236 times, and a dedicated email address and toll-free information line, through which Atticus logged "59 emails and WhatsApp conversations and 6 telephone calls." (*Id.* ¶¶ 11-12.) With all of this notice and engagement, no class member opted out or objected to the Settlement. (*Id.* ¶ 10.) This indicates overall support for the Settlement Agreement and supports final approval. *See, e.g.*, *Hashemi*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement. It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

### 6. Summary

In sum, after analyzing the Rule 23(e)(2) factors, and taking into consideration the factors the Ninth Circuit has provided to guide the court's Rule 23(e)(2) analysis, the court concludes that the Settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e)(2); *Kim*, 8 F.4th at 1178; *Roes, 1-2*, 944 F.3d at 1048; *Staton*, 327 F.3d at 959.

## C. The PAGA Settlement

Finally, the court considers the terms of the Settlement in relation to Plaintiff's PAGA claims. Under PAGA, "an 'aggrieved employee' may bring a civil action personally and on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:19-cv-07077-FWS-AJR Date: October 10, 2024
Title: Miguel Gutierrez v. New Hope Harvesting, LLC, *et al.*

behalf of other current or former employees to recover civil penalties for Labor Code violations." *Arias v. Superior Ct. of San Joaquin Cnty.*, 209 P.3d 923, 930 (Cal. 2009). An "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c). In bringing a PAGA suit, an employee acts as "as the proxy or agent of the state's labor law enforcement agencies," *Arias*, 209 P.3d at 933, rather than as a representative of a group of people in the class-action sense, *see Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1121 (9th Cir. 2014). Civil penalties recovered in a PAGA action are divided 65% and 35% between the LWDA and the aggrieved employees, respectively. Cal. Lab. Code § 2699(m). And a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Arias*, 209 P.3d at 933.

A court must "review and approve any settlement" in a PAGA action. Cal. Lab. Code § 2699(*l*)(2). The settlement must also "be submitted to the [LWDA] at the same time that it is submitted to the court," *id.*, which "allow[s] the LWDA to comment on the settlement if the LWDA so desires," *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (citation omitted). "[N]either the California legislature, nor the California Supreme Court, nor the California Courts of Appeal, nor the [LWDA] has provided any definitive answer to" the standard that courts are to use in reviewing a PAGA settlement. *Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, 253 F. Supp. 3d 1074, 1075 (C.D. Cal. 2017); *see also Haralson*, 383 F. Supp. 3d at 971. "[A] number of district courts have," however, "applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 971 (citation omitted); *see also O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1134 (N.D. Cal. 2016) ("[T]he Court must evaluate . . . the adequacy of the settlement in view of the purposes and policies of PAGA."); *Williams v. Superior Ct. of L.A. Cnty.*, 398 P.3d 69, 81 (Cal. 2017) ("PAGA settlements are subject to trial court review and approval, ensuring

that any negotiated resolution is fair to those affected."). A court may use a "sliding scale" to evaluate the fairness of the PAGA settlement with the settlement of class claims for Labor Code violations. *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972. "For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled." *O'Connor*, 201 F. Supp. 3d at 1134.

In this case, the court approves the PAGA portion of the settlement, totaling $15,000. (*See* SA ¶ III.H.) For claims invoking Labor Code provisions that do not "specifically provide[]" a penalty amount, Defendants faced a penalty of $100 "for each aggrieved employee per pay period for the initial violation and [$200] for each aggrieved employee per pay period for each subsequent violation." Cal. Lab. Code § 2699(f). The wage statement provision, meanwhile, specifies a penalty—$50 for each initial violation and $100 for each subsequent one. *See id.* § 226(e)(1). Importantly, a "court may 'exercise its discretion to award lesser penalties based on the enumerated considerations' in [California Labor Code] section 2699, subdivision (e)(2), which include a determination that imposition of the maximum statutory penalty would result in an award that is unjust, arbitrary, oppressive, or confiscatory." *Carrington v. Starbucks Corp.*, 30 Cal. App. 5th 504, 529 (2018) (emphasis omitted).

As explained, the court has thoroughly analyzed the Settlement and determined it to be fair, adequate, and reasonable; the court makes the same finding with relation to the PAGA portion of the settlement, given factors including the penalties Defendants faced, the litigation risks described above, and the court's discretion to award lesser penalties. The court also notes that the Settlement also helps ensure that PAGA's purpose of benefitting the public is satisfied, *see O'Connor*, 201 F. Supp. 3d at 1134, and that the LWDA was notified of the Settlement and has not contested the Settlement. (Mot. at 5-6); *see Haralson*, 383 F. Supp. 3d at 973 ("[C]ourts have taken into account LWDA's views, or lack thereof . . . ."). Moreover, the court observes that the Settlement's "PAGA allocation is comparable to other settlements approved by district courts in this Circuit and is a minimal but acceptable amount to vindicate the LWDA's interest

in enforcing California's labor laws." *Medina*, 2023 WL 11915763, at *10 (approving $4,000 PAGA penalty) (collecting cases); *see also Cooks*, 2021 WL 5139613, at *9 (approving $50,000 PAGA penalty with gross settlement amount of $3.75 million).

However, the court observes that the Settlement allocates 75% of the $15,000 PAGA payment to the LWDA and 25% to the aggrieved employees. (SA ¶ 3.H.) At the hearing on the Motion, Plaintiff explained that this allocation was consistent with California law at the time the parties negotiated the settlement. Now, the proper allocation under California law is 65% to the LWDA and 35% to the aggrieved employees. Cal. Labor Code § 2699(m). Accordingly, the court concludes that the $15,000 PAGA penalty shall be paid from the Gross Settlement Amount with 65% ($9,750) allocated to the LWDA and 35% ($5,250) allocated to the Individual PAGA Payments.

## III. Disposition

For the foregoing reasons, the Motion is **GRANTED IN SUBSTANTIAL PART.** The Motion is **GRANTED** in all respects except that the court reduces the service award to Plaintiff to $15,000, reallocates the proposed awards to FLSA opt-in plaintiffs, calculates the fee award by applying the percentage fee award after deducting litigation and administration costs from the common fund, for a total fee award of $295,833.09, and changes the allocation of the PAGA payment to be consistent with current California law.

Initials of Deputy Clerk: mku